UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
EQT INFRASTRUCTURE LIMITED,

                                        Plaintiff,

                - against -                                  **OPINION AND ORDER**

LAWRENCE SMITH, LAWRENCE INDUSTRIES,          11-CV-0462 (CS)
INC., WATERFRONT ENTERPRISES, INC. d/b/a
GATEWAY TERMINAL, PORT SERVICE, INC.,
HARBOR LEASING LLC, LAWRENCE LEASING
CORP., CROSBY REALTY, INC., PETROLEUM
TERMINALS, INC., LEX ATLANTIC CORP., and
WHEELER BULK STORAGE, LLC,

                                        Defendants.
--------------------------------------------------------------------x

Appearances:
Mark A. Robertson
Stefania Tani
Fulbright & Jaworski L.L.P.
New York, New York
*Counsel for Plaintiff*

Michael H. Ference, Esq.
Christopher P. Milazzo, Esq.
Sichenzia Ross Friedman Ference LLP
New York, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint.  (Doc. 12.)  For

the reasons stated below, the Motion is GRANTED IN PART and DENIED IN PART.

**I.      Background**

        I assume the facts, but not the conclusions, in the Complaint ("Compl."), (Doc. 1), to be

true for purposes of Defendants' Motion.  Plaintiff is a limited liability company organized under

the laws of the Bailiwick of Guernsey.  (Compl. ¶ 1.)  Defendant Lawrence Smith resides in

Connecticut.  (*Id.* ¶ 2.)  Defendants Lawrence Industries, Inc., Waterfront Enterprises, Inc. d/b/a

Gateway Terminal, Port Service, Inc., Harbor Leasing LLC, Crosby Realty, Inc., Petroleum

Terminals, Inc., Lex Atlantic Corp., and Wheeler Bulk Storage, LLC are corporations organized

under the laws of Connecticut, and Defendant Lawrence Leasing, Corp. is a corporation

organized under the laws of Delaware (collectively, the "Corporate Defendants").  (*Id.* ¶¶ 3–11.)

The Corporate Defendants are each owned, directly or indirectly, by Mr. Smith.  (*Id.* ¶ 12.)

### A.    Negotiations to Buy Defendants' Stevedoring and Bulk Storage Businesses

Defendants own and operate stevedoring and bulk storage businesses (the "Businesses")

in and around the Port of New Haven, Connecticut, (*id.*), as well as a marine services business

(the "Marine Business"), (*id.* ¶ 19).  In the fall of 2009, Plaintiff learned of a potential

opportunity to purchase the Businesses.  (*Id.* ¶ 15.)  In a letter dated November 19, 2009,

Plaintiff submitted an offer to purchase 100% of the Businesses, which Plaintiff valued at

between $65 and $90 million.  (*Id.* ¶ 16.)  Plaintiff sent this letter to Covington Associates

("Covington"), an investment bank that represented Defendants in connection with the possible

sale of the Businesses.  (*Id.*)

From the outset, both Plaintiff and Defendants understood that Plaintiff, as a foreign

entity, could not own or operate the Marine Business,[1] and thus would not purchase it.  (*Id.* ¶ 17.)

In December 2009, Covington informed Plaintiff that the high end of Plaintiff's valuation of the

Businesses was less than other offers Defendants had received for them and less than the price to

which Mr. Smith would agree.  (*Id.* ¶ 18.)  In January 2010, Covington informed Plaintiff that

Defendants had received various offers to buy the Businesses and Marine Business for $150

---

[1]    The Merchant Marine Act of 1920 provides that "a vessel may not provide any part of the transportation of merchandise by water, or by land and water, between points in the United States to which the coastwise laws apply, either directly or via a foreign port, unless the vessel is wholly owned by citizens of the United States for purposes of engaging in the coastwise trade."  46 U.S.C. § 55102.

million. (*Id.* ¶ 19.) Covington stated that Mr. Smith valued the Marine Business at about $25 million and that Defendants were seeking $125 million for the Businesses separately. (*Id.*) On January 29, 2010, Plantiff told Covington that Plaintiff believed it was in a position to bid between $100 and $110 million for the Businesses. (*Id.* ¶ 20.) Covington responded that Mr. Smith was looking for $125 million for the Businesses, not including the Marine Business, but that Mr. Smith was willing to negotiate with Plaintiff. (*Id.*)

On February 26, 2010, Covington informed Plaintiff that Defendants had chosen Plaintiff as one of two preferred bidders, and that as a result, Defendants would make a physical data room available so that Plaintiff could engage in due diligence. (*Id.* ¶ 21.) On March 5, 2010, Plaintiff submitted a second offer to Covington to purchase 100% of the Businesses. (*Id.* ¶ 22.) Plaintiff valued the Businesses at between $100 and $110 million. (*Id.*)

Beginning in April 2010, Plaintiff began negotiating directly with Defendants. (*Id.* ¶ 23.) On May 14, 2010, Plaintiff proposed to Defendants that it was prepared to offer between $100 and $105 million. (*Id.* ¶ 24.) By letter dated June 21, 2010, Defendants gave Plaintiff a counterproposal of $125 million. (*Id.* ¶ 25.) On June 25, 2010, Plaintiff responded with a counterproposal of between $100 and $105 million. (*Id.* ¶ 26.) On June 28, 2010, Defendants responded that Mr. Smith would meet with Plaintiff only if Plaintiff believed it could reach a suitable price somewhere between $110 and $125 million. (*Id.*)

On July 8, 2010, Plaintiff offered to buy the Businesses for $105 million. (*Id.* ¶ 27.) On July 12, 2010, Defendants sent a counterproposal from Mr. Smith dated July 9, 2010 for $110 million. (*Id.*) Defendants stated that none of the Marine Business would be included in that price. (*Id.*) On July 16, 2010, Mr. Smith offered to sell "most" of the Businesses for $105 million, again specifically excluding the Marine Business. (*Id.* ¶ 28.)

### B.       The August 6, 2010 Letter of Intent

After more negotiations, Plaintiff and Defendants entered into a letter of intent dated August 6, 2010 (the "LOI"), signed by Michael Newton and Nigel Govett, directors of Plaintiff, and Mr. Smith.  (*Id.* ¶ 29; Milazzo Decl. Ex. A.[2])  Above Mr. Smith's name, the acknowledgment reads "ACKNOWLEDGED AND AGREED on behalf of the Company."  (LOI 4.)  The LOI described the "Possible Transaction" as Plaintiff's purchase of the "Stevedoring and Bulk Storage" businesses, "but excluding the Marine Services operations," for $110 million.  (*Id.* at 1.)

Plaintiff's obligation to close the Possible Transaction was "subject to the satisfaction of conditions customary of a buyer in transactions of this type including . . . execution of a definitive purchase agreement (the 'Definitive Agreement') and related agreements . . . reflecting the terms of the Possible Transaction reasonably satisfactory in form and substance to the parties."  (*Id.* ¶ 2, at 1.)  In paragraph four, titled "Exclusivity," Defendants agreed that, "until the earlier of (i) September 8, 2010 and (ii) the date on which [Plaintiff] advises [Defendants] in writing that Plaintiff is terminating all negotiations regarding a Possible Transaction (the "Exclusivity Period"), it [would] work with [Plaintiff] in good faith and on an exclusive basis with respect to a Possible Transaction," and would not "solicit, initiate, encourage or facilitate the submission of inquiries, proposals or offers" from any other entity.  (*Id.* ¶ 4, at 2.)  The parties also acknowledged that Plaintiff would "expend considerable time, effort, and expense in connection with the Possible Transaction."  (*Id.* at 1.)

---

[2]       "Milazzo Decl." refers to the Declaration of Christopher P. Milazzo in Support of Defendants' Motion to Dismiss the Complaint.  (Doc. 13.)  On a motion to dismiss, the Court may consider "facts alleged in the complaint and documents attached to it or incorporated in it by reference."  *Weiss v. Inc. Vill. of Sag Harbor*, No. 10-CV-2603, 2011 WL 222480, at *4 (E.D.N.Y. Jan. 24, 2011) (internal quotation marks omitted).  The Complaint refers to and quotes from the Letter of Intent, thus incorporating it.  Accordingly, I may consider the LOI on this Motion to Dismiss even though it was not attached to the Complaint.

Paragraph five of the LOI, titled "Non-Binding Effect," states that the letter did not create any binding obligation, "to enter into the Definitive Agreement or to effect the Possible Transaction," nor "any other binding obligation, except as set forth in paragraphs 4, 6, 7, 8, and this paragraph 5, which provisions will be binding upon and inure to the benefit of the parties." (LOI 3, ¶ 5.)  The LOI does not state that the Possible Transaction was conditioned on the sale of the Marine Business to a buyer other than Plaintiff.

After the parties executed the LOI, Plaintiff conducted due diligence in connection with the Possible Transaction.  (Compl. ¶ 30.)  Plaintiff began drafting the purchase and sale agreement and worked with Defendants to prepare the necessary requests for government approvals.  (*Id.*)  Plaintiff also hired lawyers, accountants, and other consultants in connection with its due diligence, spending over $1.5 million.  (*Id.*)

### C.   The October 19, 2010 Letter

In a letter dated October 19, 2010 (the "October 19th Letter"), Defendants' counsel stated that Defendants would not sell the Businesses for $110 million because Defendant Gateway Terminal "has sought alternative buyers for the marine fleet but to no avail," resulting in Mr. Smith having to run the Marine Business for an extended period of time.  (Milazzo Decl. Ex. B.)[3] Therefore, in order to make the deal with Plaintiff for the Businesses economically viable for Mr. Smith, Defendants requested an increase of the purchase price from $110 to $125 million.  (*Id.*) Prior to the October 19th Letter, Defendants had not informed Plaintiff that the purchase price of $110 million was contingent on Mr. Smith's ability to sell the Marine Business, (Compl. ¶¶ 29, 32, 33), but, Plaintiff alleges, Defendants knew during their negotiations with Plaintiff "that they

---

[3]   I may consider the October 19th Letter on this Motion to Dismiss, even though it was not attached to the Complaint, because the Complaint refers to it.  *See Weiss*, 2011 WL 222480, at *4.

would not sell the stevedoring and bulk storage operations for $110 million unless Mr. Smith could sell the marine services business," (*Id.* ¶ 37).

>    **D.      Procedural Posture**

On January 21, 2011, Plaintiff sued Defendants, alleging fraud and breach of contract. (*See* Compl.)  On July 8, 2011, Defendants made a motion to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that both causes of action fail as a matter of law and that Mr. Smith may not be held personally liable for the alleged breach of contract.  (*See* Ds' Mem.)[4]

**II.**   <u>**Discussion**</u>

>    **A.      Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 129 S. Ct. at 1950.

---

[4]      "Ds' Mem." refers to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint Pursuant to F.R.C.P. 9(b) and 12(b)(6).  (Doc. 14.)

In considering whether a complaint states a claim upon which relief can be granted, the court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

### B.    Breach of Contract

Plaintiff alleges that Defendants breached their binding obligation to negotiate in good faith under the LOI by "negotiating with [Plaintiff] when Defendants knew that they would not sell the stevedoring and bulk storage operations for $110 million unless Mr. Smith could sell the marine services business." (Compl. ¶ 37, *see also* P's Mem. 4–9.[5])  I find that Plaintiff has plausibly stated a claim for breach of contract.

Under New York law,[6] a claim for breach of contract requires a plaintiff to establish (1) the existence of a contract, (2) performance of plaintiff's obligations under the contract, (3) breach of the contract by defendant, and (4) damages to the plaintiff caused by the breach. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).  "[T]he words employed in the agreement must be given their plain meaning," and the agreement must be "construed to accord a meaning and purpose to each of its parts." *Siebel v. McGrady*, 566

---

[5]      "P's Mem." refers to Plaintiff EQT's Opposition to Defendants' Motion to Dismiss.  (Doc. 15.)

[6]      The LOI states that New York law shall govern.  (LOI 3 ¶ 7.)  The parties agree that New York law is controlling.

N.Y.S.2d 736, 738 (3d Dep't 1991) (internal quotation marks omitted); *see Marmer Bros. Constr., LLC v. Midwest Steel, Inc.*, No. 99-CV-11681, 2000 WL 1341546, at *4 (S.D.N.Y. Sept. 18, 2000) ("The primary objective in interpreting a contract is to give effect to the intent of the parties 'as revealed by the language they chose to use.'") (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).  The issues on this Motion are (1) whether a binding obligation existed, and (2) whether Defendants breached that obligation.  I address each issue in turn.

> 1.     Binding Good Faith Obligation Under the LOI

The Second Circuit has interpreted New York law as having two types of preliminary agreements that create binding obligations:  "Type I" and "Type II."  *See Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005); *see also FCOF UB Secs. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 229 (S.D.N.Y. 2009) ("There are at least two distinct types of binding preliminary agreements.").[7]  A Type I agreement is "complete, reflecting a meeting of the minds on all the issues perceived to require negotiation," and as such, "binds both sides to their ultimate contractual objective."  *Brown*, 420 F.3d at 153 (internal quotation marks omitted).  Type I agreements are executed with the expectation of a subsequent, more formal agreement, but they

---

[7]     The New York Court of Appeals, in *IDT Corp. v. Tyco Grp., S.A.R.L.*, 13 N.Y.3d 209 (2009), recently cast this Type I/Type II distinction as "rigid" and not useful, but "d[id] not disagree with the reasoning in federal cases." *Id.* at 213 n.2.  *But see Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 50 (1st Dep't 2010) ("However, our Court of Appeals recently rejected the Federal Type I/Type II classifications as too rigid . . . .") (citing *IDT*, 13 N.Y.3d at 213 n.2).  In *IDT*, the court found that a preliminary settlement agreement did not bind the parties to their ultimate contractual goal because, based on the written terms only, the agreement contemplated the negotiation of later agreements, the consummation of which was a precondition to a party's performance.  *Id.* at 213–14.  As will become clear, I need not reach the issue of whether the Type I/Type II approach is proper in light of *IDT* because both parties agree that there was no Type I agreement and that the issue is only whether there was a binding good faith obligation.  (*See* Ds' Mem. 9–10; P's Mem. 5–6.)  The *IDT* court answered this question affirmatively, and also found that the parties did not breach their good faith obligation, without analysis. *Id.* at 214–15.

are enforceable even if a more formal agreement never materializes. *See Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 410 (S.D.N.Y. 2011) ("Even if the parties failed to produce a more formal agreement, a party to a Type I preliminary agreement may demand performance of the transaction."); *Cohen v. Lehman Bros. Bank, FSB*, 273 F. Supp. 2d 524, 528 (S.D.N.Y. 2003) ("fully binding preliminary agreement" is "fully binding") (internal quotation marks omitted). On the other hand, Type II agreements are "binding only to a certain degree, reflecting agreement on certain major terms, but leaving other terms open for further negotiation." *Brown*, 420 F.3d at 153 (alteration and internal quotation marks omitted); *see also Cohen*, 273 F. Supp. 2d at 528 (a "binding preliminary commitment . . . is binding only to a certain degree") (internal quotation marks omitted). "Type II agreements do not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework." *Brown*, 420 F.3d at 153 (alterations and internal quotation marks omitted). "Indeed, if a final contract is not agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 48 (2d Cir. 1998); *see also Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d Cir. 2008) ("If the parties fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation.") (internal quotation marks omitted).

The parties agree that the LOI is not a Type I agreement, but dispute whether it is a Type II agreement that binds the parties to negotiate in good faith. (Ds' Mem. 9–10; P's Mem. 5–6.) The following factors are relevant in determining whether the parties have reached a binding Type II agreement: "(1) whether the intent to be bound is revealed by the language of the

agreement, (2) the context of the negotiations, (3) the existence of open terms, (4) partial performance, and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions."  *Brown*, 420 F.3d at 157; *Learning Annex*, 765 F. Supp. 2d at 411.  Although some of these factors are the same as those applied to determine whether a document is a Type I agreement, "they have a somewhat different significance" in determining whether that document is a Type II agreement.  *Learning Annex*, 765 F. Supp. 2d at 411 (internal quotation marks omitted).  For example, the language of a Type II agreement need only evidence "an intention to be bound to the document as a general framework in which the parties will proceed in good faith toward the contractual goal."  *Id.* (alterations, emphasis, and internal quotation marks omitted); *see Brown*, 420 F.3d at 157.  Similarly, while the existence of open terms creates a presumption against a Type I agreement, those open terms may support finding a Type II agreement.  *Learning Annex*, 765 F. Supp. 2d at 411.

　　　　If an agreement is a Type II agreement, the parties are obliged to negotiate in good faith during its existence, an obligation that precludes the imposition of conditions not found in the preliminary agreement.  *See Brown*, 420 F.3d at 153; *Adjustrite*, 145 F.3d at 48.  Even if an agreement is not a Type II agreement, parties can contractually obligate themselves to negotiate in good faith.[8]  Here the parties plainly did so, at least for the period from August 6, 2010 to September 8, 2010:  paragraph four states that Defendants, "until September 8, 2010[,] . . . will work with [Plaintiff] in good faith with respect to [the] Possible Transaction," and paragraph five states that the LOI shall not "shall not create any binding obligation . . . except as set forth in

---

[8]　　　The cases that the Court has reviewed regarding Type II agreements do not explore this avenue because, unlike here, there was no explicit, unambiguous good faith provision in the preliminary agreement.  *See, e.g.*, *Brown*, 420 F.3d at 158; *FCOF*, 663 F. Supp. 2d at 229–30; *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499–500 (S.D.N.Y. 1987).

paragraph[] 4 . . . and this paragraph 5, which provisions will be binding."  (LOI ¶¶ 4–5, at 2–3.)[9]
Paragraph four also reflects Defendants' agreement to "work with" Plaintiff "with respect to a
possible transaction" during the Exclusivity Period, language similar to that which the Second
Circuit has found to indicate a Type II agreement.  *See Brown*, 420 F.3d at 158 ("work together"
was language in preliminary agreement indicating intention to be bound).

Defendants attempt to dodge this unambiguous language by selectively emphasizing
other portions of the LOI.  Defendants argue that the LOI speaks of "non-binding proposals,"
"preliminary discussions" and a "possible transaction," and that paragraph five states that the
LOI "shall not create any binding obligation."  (Ds' Mem. 9.)  Defendants then admit that
paragraph four, the duty to negotiate in good faith, is binding, but argue that the purchase price is
listed in paragraph one of the LOI, which paragraph five does not specify as binding.  (*Id.*)
Further, Defendants note that paragraph two (a non-binding paragraph), "Conditions and
Approvals," contemplates the execution of a "Definitive Agreement" that is "reasonably
satisfactory in form and substance to the parties."  (Ds' Mem. 11.)  Defendants' arguments miss
the point.  Plaintiff claims Defendants have breached their obligation to negotiate in good faith,
not an obligation to reach a Definitive Agreement at a purchase price of $110 million.  I agree
with Plaintiff that paragraphs four and five of the LOI unambiguously indicate the good faith
obligation is binding.  This view is consistent with the rest of the LOI, which does not bind the
parties to reach a final agreement or a purchase price of $110 million.  Indeed, that other terms
such as the purchase price are not binding reinforces and highlights the LOI's designation of the
obligation to negotiate in good faith as binding.  Defendants' reading of the LOI is at odds with

---

[9]    The current discussion is limited to whether the LOI created a binding obligation to negotiate in good faith.
Below, I address the effect of the Exclusivity Period, and whether Defendants breached an obligation to
negotiate in good faith until the end of that period.

long-standing New York contract law, as it would require the Court to render superfluous the language in paragraph five of LOI stating that paragraph four is an exception to the LOI's non-binding effect.  *See Graphic Scanning Corp. v. Citibank, N.A.*, 499 N.Y.S.2d 712, 714 (1st Dep't 1986) ("An interpretation which renders a clause absolutely meaningless should be avoided."). Accordingly, Defendants had an obligation under paragraphs four and five to negotiate in good faith during the Exclusivity Period.

Whether the LOI is a Type II agreement resulting in an obligation to negotiate good faith beyond the Exclusivity Period is a closer question.  The first factor, the intent to be bound as evidenced by the language of a preliminary agreement, is the most important.  *FCOF*, 663 F. Supp. 2d at 229; *Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 446 (S.D.N.Y. 2003).  If the language of the agreement is clear that the parties did not intend to be bound, the court need not look any further.  *Cohen*, 273 F. Supp. 2d at 528.  Here, paragraph five makes clear that apart from the Exclusivity Period, the parties intended no binding obligation.  On the other hand, paragraph four's reference to Defendants' obligation to "work with [Plaintiff] and its affiliates in good faith and on an exclusive basis with respect to a Possible Transaction" during the period from August 6, 2010 to September 8, 2010 arguably is intended to delineate the time frame in which Defendants would negotiate only with Plaintiff for sale of the Businesses, not to suggest that the parties would be free to negotiate in bad faith after September 8, 2010.  Thus, the first factor does not cut as strongly in favor of Defendants as it otherwise might.

The second factor, the context of the negotiations, "favor[s] the finding of a binding good faith obligation to proceed towards the goals stated" in a preliminary agreement when the "parties' history of past business relationships and extended business discussions prior to [the

preliminary agreement] implies that future discussions to reach the ultimate contractual goals were contemplated." *Learning Annex*, 765 F Supp. 2d at 415 (several months of discussion and negotiation between the parties favored finding binding good faith obligation); *Spencer Trask*, 383 F. Supp. 2d at 446–47 (at least two meetings and several conversations regarding deal prior to preliminary agreement slightly favored finding a binding preliminary agreement).  Here, Plaintiff has alleged that the Letter of Intent culminated about nine months of negotiations and several rounds of offers and counteroffers for the Businesses.  (*See* Compl. 3–7.)  This lengthy negotiation period prior to the execution of the LOI plausibly supports the conclusion that the parties intended to continue negotiating after the LOI, and thus were bound to do so in good faith.

The third factor, the existence of open terms, favors Defendants.  The LOI contemplates the subsequent Definitive Agreement "reflecting the terms of a Possible Transaction reasonably satisfactory in form and substance to the parties."  (LOI ¶ 2, at 2.)  While open terms are by definition found in Type II agreements, *see Tribune*, 670 F. Supp. at 499 ("But open terms obviously have a somewhat different significance where . . . the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms.  To consider the existence of open terms as fatal would be to rule, in effect, that preliminary binding commitments cannot be enforced.  That is not the law."), here there are no terms of a final agreement except the purchase price, rendering the LOI less of a "framework" than other agreements that have been found to be Type II agreements.  *See, e.g.*, *Brown*, 420 F.3d at 150 (binding Type II agreement set forth "general working framework" including basic design parameters for real estate project, provisions for division and distribution of future proceeds, and specific responsibilities of each party); *FCOF*, 663 F. Supp. 2d at 226 (binding preliminary asset purchase agreement specified a

closing date subject to negotiation and execution of a mutually acceptable Asset Purchase and

Interim Servicing Agreement, which was executed and attached to the preliminary agreement);

*Tribune*, 670 F. Supp. at 494, 499, 501 (binding preliminary agreement contained a two-page

term sheet, covering all basic economic terms of a loan, which "sufficiently specified the

important terms to make the commitment letter agreement meaningful and enforceable").

  As to the fourth factor, partial performance, such as completing due diligence and legal

steps in furtherance of achieving the ultimate contractual goal, can give rise to binding

obligations contemplated in preliminary agreements.  *FCOF*, 663 F. Supp. 2d at 230 (plaintiff

established two trusts to hold loans in question and completed due diligence in connection with

asset purchase).  Here, the LOI contemplated that Plaintiff would "expend significant time,

effort, and expense in connection with the Possible Transaction," (LOI 1), and Plaintiff did so

after the LOI was executed, hiring lawyers, accountants, and consultants, at a total cost of $1.5

million so far, to conduct due diligence and draft documents necessary to complete the Possible

Transaction.  This effort weighs in favor of finding that Plaintiff and Defendants were bound to

continue to negotiate in good faith.

  Finally, "Type II agreements, by definition, comprehend the necessity of future

negotiations and contracts," *Brown*, 420 F.3d at 158 (creation of the holding corporation,

construction, financing, and management of the Property required more formal and extensive

contracts), so that necessity—explicitly contemplated here, (*see* LOI ¶ 2, at 2–3 (regarding

agreements "containing terms customary for a transaction of this type")—does not preclude a

finding of a Type II agreement.  Accordingly, the final factor is essentially neutral in this case.

  At this stage I find it perhaps not likely, but plausible that a Type II agreement was

intended, and that Defendants thus had an obligation beyond September 8, 2010 not to impose

new conditions, such as one that Defendants find a buyer for the Marine Business.  The question

is close, however, and may be addressed again on summary judgment.

> 2.      Breach of Good Faith Obligation

Defendants argue that because this good faith obligation expired on September 8, 2010

and no agreement was reached by that date, Plaintiff's breach of contract claim must fail.  (Ds'

Reply 5–6.)[10]  By the time Defendants sent the October 19th Letter, they argue, the Exclusivity

Period had expired, and thus Defendants were free to decline to sell the Businesses to Plaintiff

for $110 million.  To clarify the issue, Defendants could sell the Marine Business at any time,

even during the Exclusivity Period.  Plaintiff was not interested in the Marine Business, which

paragraph four of the LOI specifically carves out of Defendants' obligation not to seek other

buyers during the Exclusivity Period.  The mere fact that Defendants may have been looking for

a buyer for the Marine Business during or after the Exclusivity Period does not alone mean that

Defendants secretly conditioned the deal with Plaintiff on the sale of the Marine Business, which

could be a breach of their obligation to negotiate in good faith.  *Cf. FCOF*, 663 F. Supp. 2d at

228 (good faith obligation to negotiate "'bar[s] a party from . . . insisting on conditions that do

not conform to the preliminary agreement'") (quoting *Tribune*, 670 F. Supp. at 498).  But the

October 19th letter plausibly suggests that at least as of that date, Defendants conditioned the

sale of the Businesses to Plaintiff for $110 million on the sale of the Marine Business to another

buyer.  As I have found it plausible that the LOI was a Type II agreement, the obligation to

negotiate in good faith did not expire on September 8, 2010, and thus the imposition of a new

condition in October could violate that obligation.

---

[10]    "Ds' Reply" refers to Defendants' Reply Memorandum of Law in Further Support of Motion to Dismiss the Complaint.  (Doc. 16.)

Even if Defendants' good faith obligation expired on September 8, 2010, however, Plaintiff has plausibly alleged that Defendants breached their obligation before then. Defendants allegedly knew during negotiations—before the September 8, 2010 expiration of the Exclusivity Period—that they would not sell the Businesses for $110 million unless Mr. Smith could sell the Marine Business. (Compl. ¶ 37.) Accepting this factual allegation as true, Defendants secretly conditioned the sale of the Businesses on the sale of the Marine Business to a third party, breaching their obligation to negotiate in good faith.

Plaintiff's lone statement regarding Defendants' knowledge is arguably a conclusion, rather than a factual allegation, but characterizing it as a conclusion does not alter my holding. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950. And while Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," *id.*, the Rule's requirements "should not be turned into 'an insurmountable hurdle,' particularly where some of the relevant facts are within the exclusive knowledge or control of the defendants," *Campanella v. Cnty. of Monroe*, No. 10-CV-6236L, 2012 WL 537495, at *7 (W.D.N.Y. Feb 17, 2012) (quoting *Burgos v. Satiety, Inc.*, No. 10-CV-2680, 2011 WL 1327684, at *4 (E.D.N.Y. Apr. 5, 2011)).

Here—given that Plaintiff would likely not be able to allege any facts or produce any documentation at the motion to dismiss stage regarding Defendants' thought processes or dealings with third parties, construing the Complaint in the light most favorable to Plaintiff, and using my judicial experience and common sense—I find it plausible, for two reasons aside from Plaintiff's allegation, that Defendants during the Exclusivity Period secretly conditioned the sale of the Businesses to Plaintiff on the sale of the Marine Business.

First, Defendants claimed in January 2010 that they had offers to buy the Businesses and the Marine Business together for $150 million and that they valued the Marine Business at about $25 million.  (*See* Compl. ¶ 19.)  Given these facts, Defendants' willingness to sell the Businesses to Plaintiff for $110 million could suggest that, in Defendants' minds, they were also definitely selling the Marine Business for a substantial sum.[11]  Second, the October 19th letter says that the failure to sell the Marine Business resulted in Mr. Smith having to run the Marine Business for an extended period of time, but this reasoning does not seem, without more, to justify the jump in the sale price from $110 to $125 million, thus also plausibly suggesting that Defendants' unilateral plan all along was to sell the Businesses to Plaintiff for $110 million only if they could separately sell the Marine Business.

In sum, given the facts that Plaintiff has alleged, I find plausible, although perhaps not likely, the inference that Defendants secretly conditioned the sale of the Businesses to Plaintiff for $110 million on the separate sale of the Marine Business, in violation of their duty to negotiate in good faith under the LOI.  Accordingly, Defendants' Motion to Dismiss Plaintiff's breach of contract claim is denied.

### C.      Mr. Smith's Individual Liability on Plaintiff's Breach of Contract Claims

Under New York law, an agent who signs an agreement on behalf of a disclosed principal will not be individually bound to the terms of the agreement "unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal."

*Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991) (quoting *Mencher v. Weiss*, 306 N.Y. 1, 4 (1953)) (president and chief executive officer); *see Integrated Mktg. & Promotional Solutions, Inc. v. JEC Nutrition, LLC*, No. 06-CV-5640, 2006 WL

---

[11]      Perhaps Defendants did not have a $150 million offer and were puffing as part of negotiations, but I cannot so presume on a motion to dismiss.

3627753, at *3 (S.D.N.Y. Dec. 12, 2006).  In assessing whether a signatory intended to be individually bound, the following five factors (the "*Lollo* factors") should be examined:  "length of the contract, the location of the liability provision(s) in relation to the signature line, the presence of the signatory's name in the agreement itself, the nature of the negotiations leading to the contract, and the signatory's role in the corporation."  *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994).  In addition to these factors, the most obvious indicator of the signatory's intent is the signature's form.  *Israel v. Chabra*, 537 F.3d 86, 97 (2d Cir. 2008).  "'[W]here individual responsibility is demanded the nearly universal practice is that the officer signs twice—once as an officer and again as an individual.'"  *Id.* (quoting *Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 67 (1961)).

Here, Mr. Smith signed the LOI only once, so this fact weighs against imposing individual liability.  *See JEC Nutrition*, 2006 WL 3627753, at *3.  Further, two of the *Lollo* factors heavily favor him as well.  First, the LOI does not contain a liability provision purporting to bind Mr. Smith individually, and second, the Complaint does not explicitly allege that Mr. Smith agreed to, or even discussed, individual liability during the negotiations culminating in the LOI.

Regarding the presence of Mr. Smith's name in the LOI, Mr. Smith signed the letter "on behalf of the Company," which suggests corporate liability only.  Plaintiff asserts, however, that "Company" is defined as "you and the various legal entities that comprise the ownership of the Businesses," and that "you" refers to Mr. Smith, to whom the LOI is addressed.  (P's Mem. 9.)  But the LOI is not clear that "you" means Mr. Smith.  On one hand, the LOI is addressed to Defendant Gateway Terminal, not Mr. Smith; on the other, Mr. Smith's name appears in the

"Attention" line and the salutation reads "Dear Lawrence."  Even giving all reasonable

inferences to Plaintiff, the presence of Mr. Smith's name in the LOI ambiguously, not clearly or

explicitly, indicates that he intended to be bound individually.  Thus, this factor favors Mr.

Smith.

The remaining *Lollo* factors favor Plaintiff.  The LOI is three pages, not long enough to

bury fine print attempting to trap Mr. Smith into being bound individually.  *See Lehman Bros.,*

*Inc. v. Tutelar CIA Financiera, S.A.*, No. 95-CV-3772, 1997 WL 403463, at *3 (S.D.N.Y. July

17, 1997) (one page); *Paribas Props., Inc. v. Benson*, 536 N.Y.S.2d 1007, 1009 (1st Dep't 1989)

(three pages).  Further, the Complaint alleges that Mr. Smith owns, directly or indirectly, all of

the Corporate Defendants.  *See JEC Nutrition*, 2006 WL 3627753, at *6 (individual's "position

of prominence and control in his company weighs in favor of finding that he intended to be

bound").

On balance, Plaintiff has not plausibly stated that Mr. Smith clearly and explicitly

intended to be bound by the LOI in his individual capacity.  I find that the factors favoring

individual liability are strongly outweighed, or at least, giving all reasonable inferences to

Plaintiff, "clear and explicit evidence" of Mr. Smith's intent to be bound is not plausibly alleged.

Accordingly, Defendants' Motion to Dismiss Plaintiff's breach of contract claim as against Mr.

Smith is granted.

### D.      Fraud

Defendants challenge Plaintiff's fraud claims on two related grounds:  (1) Plaintiff failed

as a matter of law to sufficiently plead the elements of fraud; and (2) Plaintiff's fraud claim is

duplicative of its breach of contract claim.  I agree with Defendants' second argument, and thus

need not reach the first.

"It is black letter law in New York that a claim for common law fraud will not lie if the claim is duplicative of a claim for breach of contract." *Clifton v. Vista Computer Servs., LLC*, No. 01-CV-10206, 2002 WL 1585550, at *2 (S.D.N.Y. July 16, 2002); *see Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 589 (1st Dep't 2003). The general rule is that "a promissory statement of what will be done in the future . . . gives rise only to a breach of contract cause of action and a misrepresentation of a present fact . . . gives rise to a separate cause of action for fraudulent inducement." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) (misrepresentation of financial data, even though the subject of contractual warranties, gave rise to fraud claim); *see also Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (defendant's declaration that it had secured a large environmental law client and was in the process of establishing an environmental law department were misrepresentations of fact giving rise to fraud claim); *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980) (allegations that defendant knowingly misrepresented the health of wine grape vines, the subject of plaintiff's purchase, stated a claim for fraud); *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 437 (S.D.N.Y. 2010) (misrepresentations regarding defendant's business structure and shares in defendant's member corporation gave rise to fraud claim). The exception to this rule, however, as explained by the New York Court of Appeals in *Sabo v. Delman*, 3 N.Y.2d 155 (1957), and *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403 (1958), is that where a complaint alleges that "a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a material existing fact." *Sabo*, 3 N.Y.2d at 160 (internal quotation marks omitted); *see Sudul v. Computer Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994) ("New York's Court of

Appeals has held that a contracting party can be held liable for fraud when, at the time he made a promise, he did not intend to keep it.") (citing *Channel Master* and *Sabo*).

But this exception is itself subject to the exception that the false promise giving rise to a fraud claim cannot be a promise for which the parties contracted.  When a plaintiff's fraud claim "arises out of the same facts as [the] breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties," the fraud claim is duplicative and cannot stand.  *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (internal quotation marks omitted); *see also Sudul*, 868 F. Supp. at 62 (collecting New York appellate division cases recognizing this exception to *Sabo* and *Channel Master*).  "[S]imply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim."  *Telecom*, 280 F.3d at 175 (internal quotation marks omitted); *see also Briefstein v. P.J. Rotondo Constr. Co.*, 187 N.Y.S.2d 866, 868 (1959) (decided shortly after *Sabo* and *Channel Master*, holding, "[t]o say that a contracting party intends when he enters an agreement not to be bound by it is not to state 'fraud' in an actionable area, but to state a willingness to risk paying damages for breach of contract.").

The holdings of *Sabo* and *Channel Master* "were apparently tied to misrepresentations which were collateral or extraneous to the agreements entered into by the parties," *Spellman v. Columbia Manicure Mfg. Co.*, 489 N.Y.S.2d 304, 323 (2d Dep't 1985), rather than promises spelled out in the contracts, *see Sabo*, 3 N.Y.2d at 158, 160 (defendant knowingly misrepresented that he would finance plaintiff's invention and use best efforts to promote its sale and lease, inducing plaintiff to enter into contracts regarding the assignment of the patents and

split of the proceeds).  Accordingly, to pursue parallel breach of contract and fraud claims, the

plaintiff must "point[] to a fraudulent misrepresentation that is collateral or extraneous to the

contract." *Merrill Lynch*, 500 F.3d at 183.  Misrepresentations that are not collateral or

extraneous to the contract, even if a false promise, do not give rise to a parallel fraud claim.  *See,*

*e.g.*, *Sudul*, 868 F. Supp. at 60, 62–63 (defendants breached employment agreement by

terminating plaintiff despite satisfactory performance; "[u]nlike the defendants in *Channel*

*Master* and *Sabo*, the defendants here allegedly lied only about their intention to carry out the

express terms of the contract"); *Hudson v. Greenwich I Assocs.*, 640 N.Y.S.2d 46, 47 (2d Dep't

1996) (granting motion to dismiss fraud claim where plaintiff alleged that "defendant never

intended to carry out its promises contained in a contract for renovation of the building"); *cf.*

*Stewart*, 976 F.2d at 87, 89 (defendant's false statements that plaintiff would head environmental

law group defendant was establishing and that defendant had landed a large environmental law

client, inducing plaintiff to leave her previous job, were misrepresentations of present fact giving

rise to fraud claim).

   Here, Plaintiff argues that its fraud claim is not based on Defendants' failure to negotiate

in good faith (the basis of its breach of contract claim), but on Defendants' "misrepresentation

that they would sell the Businesses for $110 millon."  (P's Mem. 18.)  Thus, Plaintiff concludes,

as the price term was not alleged to be a term of the contract that was breached,[12] this

misrepresentation is collateral to the contract and the fraud claim should not be dismissed.  (*Id.* at

18–19.)  Plaintiff's argument fails for two reasons.

   First, Plaintiff's argument is inconsistent with the Complaint, which alleges a fraud claim

based on Defendants' "fraudulent misrepresentation that they would sell the stevedoring and

---

[12] That argument would fail, as the LOI unambiguously states that the $110 million price term was non-binding.

-22-

bulk storage operations for $110 million without the additional condition that the marine services

business would have to be sold."  (Compl. ¶ 35.)  Further, the October 19th Letter shows that

Defendants asked for a higher price because they were unable to find a buyer for the Marine

Business.  Thus, as pleaded in the Complaint, the crux of Plaintiff's fraud claim is that

Defendants falsely represented that they would sell the Businesses to Plaintiff for $110 million

whether or not they sold the Marine Business, when in reality Defendants intended to sell to

Plaintiff for $110 million only if they sold the Marine Business to someone else.  The crux of the

claim for breach of Defendants' duty of good faith under the LOI is the same:  that Defendants

did not negotiate in good faith because they represented that they would sell the Businesses to

Plaintiff for $110 million whether or not they sold the Marine Business, but concealed that they

would sell the Businesses to Plaintiff for $110 million only if they sold the Marine Business to

someone else.  The fraudulent representation thus mirrors the terms of the LOI, and thus the

fraud claim is redundant of the contract claim and cannot stand.  *See Int'l CableTel Inc. v. Le

Groupe Videotron Ltee*, 978 F. Supp. 483, 487 (S.D.N.Y. 1997) (Sotomayor, J.); *see also id.* at

488 ("[T]he gravamen of the complaint is that defendant misrepresented that it would negotiate

exclusively with plaintiff in order to induce plaintiff into entering an agreement whereby

defendant was required to negotiate exclusively with plaintiff. . . . Defendant's promise to

negotiate exclusively with plaintiff plainly was not collateral . . ., it was memorialized in that

agreement as defendant's principle obligation.  Thus, defendants' allegedly false statements of

future intent cannot support the present cause of action."); *Sudul*, 868 F. Supp. at 62 ("[W]here a

fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition

only of an allegation that defendant never intended to perform the precise promises spelled out in

the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract.").

Second, even accepting Plaintiff's argument that its fraud claim is based solely on Defendants' misrepresentation that it would sell the Businesses for $110 million regardless of whether it sold the Marine Business, that price term was spelled out in the LOI, not collateral to it, and thus Defendants' alleged false promise that it would sell for that price cannot support a fraud claim. *See Stewart*, 976 F.2d at 89 ("[P]romissory statements as to what will be done in the future . . . give rise only to a breach of contract claim . . . .") (alteration and internal quotation marks omitted); *Strojmaterialintorg v. Russian Am. Commercial Corp.*, 815 F. Supp. 103, 105 (E.D.N.Y. 1993) ("Because plaintiff does no more than allege that defendants never intended to pay . . . , its fraud claim must be dismissed.").[13]  That the price term was not binding, and thus unable to support a breach of contract claim, is irrelevant to the issue of whether it can support a fraud claim. *See Stewart*, 976 F.2d at 88, 90 (no employment contract; defendants' pledge that plaintiff would "be expected to service" defendant's client was a future promise not actionable in fraud); *Herendeen v. Champion Int'l Corp.*, 525 F.2d 130, 133 n.2 (2d Cir. 1975) ("Plaintiff . . .

---

[13]    Plaintiff seeks leave to amend on the basis that Defendants told Plaintiff after the LOI was executed that they would sell the Businesses for $110 millon, and that such misrepresentations of future intent made after the formation of the contract constitute extraneous statements giving rise to a fraud claim.  (*see* P's Mem. 17 n.6.)  The authority that Plaintiff cites, *Blank v. Baronowski*, 959 F. Supp. 172 (S.D.N.Y. 1997), however, is inapposite.  The court there interpreted misstatements made after the formation of the contract, even though "closely track[ing] the terms" of the agreement, to be "'extraneous' to the contract in that they misrepresented a present fact (i.e., that defendant believed a joint venture agreement existed) rather than defendant's future intent to honor that contract." *Id.* at 180; *see also Merrill Lynch*, 500 F.3d at 183 (misrepresentation of financial data, even though the subject of a contractual warranties, was a misrepresentation of present fact giving rise to fraud claim).  Defendants' alleged post-LOI statements are promissory—simply a representation regarding future intent to perform under the contract, not misrepresentations of present fact.  *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19–20 (2d Cir. 1996) (false statements of intent to perform under contract, even if intended to lull plaintiff into false sense of security, insufficient to state fraud claim under New York law).  Plaintiff's application for leave to amend is thus denied as futile.  *See Bazadier v. McAlary*, No. 10-CV-4956, 2012 WL 495435, at *1 (2d Cir. Feb. 16, 2012) ("[W]here amendment would be futile, denial of leave to amend is proper.").

alleges that, when made, defendants had no intention of honoring the representations . . . [and] that the representations were false . . . . The basic defect in the complaint is that the representations complained of were promissory in nature. As such, the complaint alleges an agreement to agree, unenforceable until it crystalizes into a binding agreement, rather than an action in fraud."). Accordingly, Defendant's Motion to Dismiss Plaintiff's fraud claim is granted.

**III.   <u>Conclusion</u>**

For the reasons above, Defendants' Motion to Dismiss Plaintiff's breach of contract claim is DENIED as to the Corporate Defendants and GRANTED as to Defendant Lawrence Smith. Defendants' Motion to Dismiss Plaintiff's fraud claim is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 12), and terminate Mr. Smith as a Defendant in the case. The parties are directed to appear for a conference on April 23, 2012 at 4:00 p.m.

**SO ORDERED.**

Dated: March *17*, 2012
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

-25-